STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, SS.                                    CIVIL ACTION



Docket No. CV-04-119

Henry Larson, M.D.,
        Plaintiff

        v.                                       Order (Plaintiff's Motion for
                                                 Partial Summary Judgment)

Daniel A. McNichol, M.D.,
        Defendant

JUN 1 2005

Pending before the court is the plaintiff's motion for partial summary judgment

and the plaintiff's motion to strike portions of the defendant's statement of additional

material fact. The court has reviewed the parties' submissions on these motions.

Through his motion, the plaintiff seeks a declaration that the parties' partnership has been

dissolved and that the defendant's ongoing possession of office space owned by the

partnership renders him liable for the rental value of that use and possession.

Summary judgment is proper only if the record on summary judgment shows that

there are no genuine issues of material fact and that the movant is entitled to judgment as

a matter of law. *See* M.R.Civ.P. 56. To survive a motion for a summary judgment, the

opposing party must produce evidence that, if produced at trial, would be sufficient to

resist a motion for a judgment as a matter of law; "[t]he plaintiff must establish a *prima

facie* case for each element of the cause of action." *Rodrigue v. Rodrigue*, 1997 ME 99,

¶8, 694 A.2d 924, 926.

In January 1987, the parties, who are medical doctors, entered into a partnership,

which they named BENT-Acadia Realty Associates Partnership. Their written agreement

provided that the purpose of the partnership is "acquiring, constructing, holding,

repairing, improving, operating, leasing and renting land and buildings and personal

property. . .in Evergreen Woods, a Condominium located at 700 Mt. Hope Avenue,

Bangor, Maine. . . ." The parties had been principals in a professional medical

1

association, and the association had its medical offices there. In either 2001 or 2002,[1] the parties terminated that association. However, they continued to use the same office space in Evergreen Woods: Larson and McNichol each entered into lease agreements with the partnership under which Larson rented a bit more than half of the office space, and McNichol rented the balance. Both leases were for $1 annually. On May 17, 2004, Larson sent McNichol a letter purporting to dissolve the partnership effective June 30, 2004. Larson also advised McNichol that he no longer consented to the latter's continuing use and possession of the leased partnership property.

Larson has brought this action in three claims. First, he seeks an order compelling McNichol to engage in arbitration to resolve the disputes arising from their business relationship. In count 2, he seeks orders declaring that the partnership has been dissolved and otherwise winding up the partnership affairs. Finally, he seeks a declaratory judgment that McNichol may not use partnership property for his own practice. In the motion at bar, Larson argues that he is entitled to summary judgment establishing that the partnership has been dissolved and that McNichol's ongoing possession of the premises is not for partnership purposes.

## A. Dissolution of the partnership

Section 4.3 of the partnership agreement provides, "Actions and decisions of the Partners as to all matters under this Agreement or otherwise shall be accomplished by majority vote. . . ." Relying on this language, McNichol argues that Larson did not have the authority to dissolve the partnership unilaterally. Rather, McNichol argues that, in the circumstances of this case, the partnership can be dissolved only upon the agreement of both partners, because otherwise that decision would not be of the majority.

Title 31 M.R.S.A. § 311, however, establishes that any partner may dissolve a partnership in the absence of any agreement to do so, when the partnership is not for a "definite term or undertaking. . . ." The parties' partnership was not for a definite term. Further, it was not created for a particular undertaking because its function is to maintain and lease property. *See Chandler Medical Building Partners v. Chandler Dental Group*, 855 P.2d 787, 794 (Ariz. 1993); *Bank v. Haley*, 332 A.2d 443, 447 (Pa. 1975). McNichol does not argue otherwise here. As the *Bank* Court noted, a particular undertaking "must

---

[1] The parties' statements of material fact reveal a dispute about the date.

2

be capable of accomplishment at some time, although the exact time may be unknown and unascertainable at the date of the agreement. Leasing property, like many other trades or businesses, involves entering into a business relationship which may continue indefinitely. . . ." *Id.* at 447. Therefore, the subject partnership is not one of those that falls outside of the scope of section 311, which empowers one partner with the right to dissolve a partnership upon expression of his "express will," irrespective of whether any or all other partners agree with that effort. Rather, it is an "at will" partnership. For these reasons, the record on summary judgment establishes as a matter of law that Larson was authorized to – and did in fact – take steps that were sufficient to dissolve the partnership effective June 30, 2004.

## B. McNichol's continuing possession of partnership property

Section 4.4 of the parties' partnership agreement provides, "No partner without the consent of all other Partners. . .shall. . .[p]ossess Partnership property. . .for other than a Partnership purpose." *See also* 31 M.R.S.A. § 305(1) (a partner may not possess partnership property for non-partnership purposes absent consent of the remaining partners). In the motion at bar, Larson contends that McNichol may not continue to possess office space owned by the partnership that he had leased from that entity. This argument is based on factual contentions that the partnership is now dissolved, that McNichol's use of the property is not for partnership purposes and that he (Larson) has withdrawn his consent to McNichol's use of the leased premises.

Here, one of the express purposes of the parties' partnership was to enter into leases of its property, and the partnership did so by leasing office space to McNichol under a verbal agreement. That lease appeared to create a yearlong tenancy. The record, however, discloses no other material terms of the lease.[2] The silence of the record on this point makes it impossible to determine, from that record, the parties' relative legal rights and liabilities. Larson's argument in support of this aspect of his motion rests entirely on the effect of his withdrawal of consent for McNichol's lease-based possession of the office space he has used for several years. However, the very fact that McNichol entered

---

[2] The record indicates that both parties agreed to lease their respective areas of the office space for $1 per year. In his reply statement of material facts, Larson asserts that McNichol did not pay his dollar. The court does not regard this as a material circumstance that would affect the parties' rights here.

3

into a lease agreement in 2001 or 2002 establishes that, at least at that time, Larson agreed to the partnership's lease of space to McNichol (as well as to Larson himself). Under the partnership agreement, the partnership may act only upon agreement of a majority of the partners, which, here, means both of them. Larson's legal argument, however, fails to account for any contractual obligation the partnership may still have toward McNichol, arising from the lease. For example, in some circumstances, when a tenant in a term of years continues possession of the premises after the expiration of the yearlong term, the lessor may be deemed to have agreed to a renewal of the lease. *See Moshier v. Reding*, 12 Me. 478, 483 (1835). *See also Throumoulos v. Bernier*, 143 Me. 286, 288 (1948). Here, Larson dissolved the partnership within the past year and withdrew his consent to McNichol's lease effective on the dissolution date, June 30, 2004. There is no record evidence that, prior to that date, Larson had withdrawn the consent to lease. Because there is virtually no meaningful evidence about the terms or dates of the lease, this record leaves open the possibility, for example, that the lease may have been renewed prior to June 30, 2004, but less than one year from the date of this order. Because Larson has not demonstrated that McNichol's contractual rights may be defeated by Larson's mere declaration to terminate the lease, the court will not adopt such a conclusion.

In this context, it bears note that the partnership's dissolution status by itself does not operate to vitiate its lease to McNichol. Rather, a dissolved partnership continues to exist until its affairs are wound up. 31 M.R.S.A. § 310. The partnership is authorized, even post-dissolution, to perform those obligations it created prior to the dissolution. *See Scholastic, Inc. v. Harris*, 259 F.3d 73, 85 (2nd Cir. 2001). This means that the dissolution itself may not have voided any lease agreement that was in existence with McNichol when the dissolution was effected. However, the process of winding up is often understood to be more limited than McNichol suggests. When a partnership is winding up subsequent to dissolution, partnership affairs are settled: the partnership's liabilities and obligations are settled, and the partnership assets are liquidated and distributed. *See Miami Subs Corp. v. Murray Family Trust*, 703 A.2d 1366, 1373 (N.H. 1997). And dissolution terminates a partner's authority to act on behalf of the partnership in transactions involving other partners. *See* 31 M.R.S.A. § 313.

4

For purposes of the motion at bar, however, the court need only address one of the several factual possibilities generated by this record, namely, the arguable renewal of the lease between the partnership and McNichol effective less than one year ago, but prior to the dissolution date. This one possibility precludes a finding that McNichol necessarily has occupied the premises outside of the terms of the lease with the partnership.

The entry shall be:

The plaintiff's motion for summary judgment is granted in part and denied in part. The record establishes that the parties' partnership was dissolved effective June 30, 2004. Beyond this, the motion is denied.

The plaintiff's motion to strike is dismissed. Even if motions to strike are allowed by rule, and even if such a motion is appropriate here, none of the challenges affect material portions of the record on summary judgment.

Dated: March 10, 2005

_____
Justice, Maine Superior Court
Jeffrey L. Hjelm

HENRY LARSON MD - PLAINTIFF
P O BOX 250
HAMPDEN ME 04444
Attorney for: HENRY LARSON MD
CHARLES GILBERT III - RETAINED 06/10/2004
GILBERT & GREIF
82 COLUMBIA ST
PO BOX 2339
BANGOR ME 04402-2339


vs
DANIEL MCNICHOL MD - DEFENDANT
238 HUSSON AVE APT 2L
BANGOR ME 04401
Attorney for: DANIEL MCNICHOL MD
MARVIN GLAZIER  - RETAINED 07/15/2004
VAFIADES BROUNTAS & KOMINSKY
23 WATER STREET
PO BOX 919
BANGOR ME 04402-0919

SUPERIOR COURT
PENOBSCOT, ss.
Docket No   BANSC-CV-2004-00119

**DOCKET RECORD**

Filing Document: APPLICATION        Minor Case Type: ARBITRATION AWARDS
Filing Date: 06/10/2004
Filing Document: FILING MOTION       Minor Case Type: ARBITRATION AWARDS
Filing Date: 06/10/2004

## Docket Events:

06/11/2004 FILING DOCUMENT - APPLICATION FILED ON 06/10/2004
        COMPLAINT AND APPLICATION TO COMPEL ARBITRATION AND TO APPOINT ARBITRATOR(S) UNDER THE
        UNIFORM ARBITRATION ACT WITH EXHIBIT A & B ATTACHED.

06/11/2004 Party(s):  HENRY LARSON MD
        ATTORNEY - RETAINED ENTERED ON 06/10/2004
        Plaintiff's Attorney: CHARLES GILBERT III

06/11/2004 FILING DOCUMENT - FILING MOTION FILED ON 06/10/2004
        PLAINTIFF'S MOTION FOR APPOINTMENT OF A RECEIVER AND MEMORANDUM OF LAW IN SUPPORT OF
        APPLICATION TO COMPEL ARBITRATION AND FOR APPOINTMENT OF A RECEIVER WITH PROPOSED ORDER.

06/11/2004 Party(s):  HENRY LARSON MD
        OTHER FILING - REQUEST FOR HEARING FILED ON 06/10/2004
        BY PLAINTIFF ON APPLICATION TO COMPEL ARBITRATION AND FOR APPOINTMENT OF A RECEIVER.
        TESTIMONIAL, 1.50 HOURS.

06/15/2004 CERTIFY/NOTIFICATION - CASE FILE NOTICE SENT ON 06/15/2004
        TO ATTORNEY FOR PLAINTIFF.

06/17/2004 Party(s):  DANIEL MCNICHOL MD
        SUMMONS/SERVICE - CIVIL SUMMONS SERVED ON 06/11/2004
        AS TO DEFENDANT.

06/17/2004 Party(s):  DANIEL MCNICHOL MD
        SUMMONS/SERVICE - CIVIL SUMMONS FILED ON 06/17/2004

Printed on: 03/11/2005

STATE OF MAINE                     SUPERIOR COURT
PENOBSCOT, SS.                     CIVIL ACTION
                                  Docket No. CV-04-119

                                  J ̣ ˑ ̣ ᵢᵉ ᵀ ⁄ ᴵ ̣ ̣

Henry Larson, M.D.,
        Plaintiff


        v.                        Decision and Judgment    FILED & ENTERED
                                                           SUPERIOR COURT

                                                           SEP 18 2006

                                                           PENOBSCOT COUNTY

Daniel I. McNichol, M.D.,
        Defendant[1]


        Hearing was held on the complaint. Both attorneys of record and the defendant,

Daniel McNichol, were present. The plaintiff, Henry Larson, appeared through counsel,

and his testimony was presented in transcript form. The court has considered the

evidence in conjunction with the parties' written summations.

        The parties are medical doctors. For a time, they were principals in a medical

practice, Bangor Ear Nose Throat Associates (BENT). They also were the sole partners

of a Maine partnership, Bangor Ear Nose Throat-Acadia Realty Partnership (BENT-AR),

which owned the two condominium units where the practice was located. Until the

parties dissolved BENT in the early 2000's, BENT-AR leased the condominium premises

to BENT. After the parties terminated their joint practice, both of them continued to

maintain their own medical practices – now separate from each other – in the

condominium space owned by BENT-AR. As the court has previously ruled in the

summary judgment order dated March 10, 2005, Dr. Larson dissolved BENT-AR

effective June 30, 2004, which was several months prior to the time he moved out of

state. Dr. McNichol continued to occupy the condominium space until it was sold in

June 2005. The parties have raised three categories of issues in this case: first, how

should existing partnership assets and liabilities be divided between the parties to

accomplish a final accounting and reconciliation; second, whether Dr. Larson entitled to

---

[1] The pleadings variously reflect Dr. McNichol's middle initial as "A" and "I." The
written agreements between the parties that are included in the record suggest the latter,
which the court uses in the caption.


1

relief arising from the disposition of personal partnership property; and third, whether either party is entitled to relief for the value of rent and the amount of expenses paid arising between July 15, 2004, (after BENT-AR was dissolved and when Dr. Larson vacated the premises) and the date when BENT-AR sold the premises to a third party.

## A. Accounting and reconciliation of partnership assets and liabilities

In this portion of the order, the court addresses two issues; the division of proceeds in the partnership checking account, and the division of rent paid to and retained by Dr. McNichol subsequent to the partnership dissolution. The court defers consideration of post-dissolution partnership expenses to its discussion of Dr. McNichol's post-dissolution possession of the condominium premises.

The current balance in the checking account is $6,396.03. This includes $5,000 that was paid to BENT-AR as a deposit for the sale of the premises, which closed in June 2005. Dr. McNichol contends that he is entitled to receive more than half of the checking account money because, he claims, Dr. Larson had contributed an amount to the account that fell short of the expenses he incurred and for which the partnership made payments. The factual basis for this contention is found in defendant's exhibit 16 and the corresponding transcribed testimony of Dr. McNichol's bookkeeper. The court sustains the objection to defendant's exhibit 16, because at best that document purports to show that as of January 1, 2005, Dr. Larson had underpaid the checking account by slightly more than $1,600 (that is, that the money in the partnership checking account was used to pay expenses attributable to Dr. Larson that were $1,600 more than the amount he paid into that account). The salient question, however, is whether as of June 30, 2004 (rather than at the beginning of 2004 or 2005), Dr. Larson had not adequately funded the checking account, as the level of funding may be determined by the amount of expenses for which he was responsible under the parties' agreement.

Further, the court finds that Dr. Larson sometimes made direct payments to the partnership's vendors prior to the commencement of a calendar year in order to gain an accelerated tax benefit from payment of such expenses. As is noted below, the amount of 2004 expenses that he paid in late 2003 is not entirely clear. Nonetheless, defendant's exhibit 16 fails to account for those pre-payments. Rather, the calculations in that exhibit are based on an assumption that BENT-AR itself made all the payments associated with

2

the premises. This is not so, and therefore those calculations do not fully reflect the amounts that Dr. Larson paid and for which he should be credited. Thus, the probative value of defendant's exhibit 16 is highly limited because it focuses on dates that are not material, and the exhibit is not based on a correct analysis of the parties' payment for expenses.

Dr. Larson argues that he is entitled to more than half of the checking account proceeds because of the prepayments noted above.[2] The only payments made by Dr. Larson that could be seen as prepayments were (a) three checks that he sent directly to Kinney Office Supply in the cumulative amount of $1,124 to cover the cost of an annual equipment maintenance contract; and (b) that part of a payment made to the City of Ellsworth for taxes covering the period of time between January 1, 2004, and June 30, 2004 (this amounts to half of the $100 payment that Dr. Larson made directly to the city). *See* plaintiff's exhibit 39. The court infers that the payments to Kinney covered a partnership expense[3] for 2004. Because Dr. Larson paid these partnership expenses directly, it would not be reflected in defendant's exhibit 16 or other records of partnership financial transactions, such as defendant's exhibit 2. He therefore is entitled to reimbursement of $587, which is half of the amount he paid. Dr. Larson argues that the amount of this credit should be greater. However, with the exception of the payments noted above, the schedule of payments he made directly to vendors in 2003 do not clearly constitute prepayments that would form the basis for an adjustment of the division of partnership cash here.

Thus, of the checking account balance, Dr. Larson shall be entitled to receive $587, and the parties shall equally divide the remaining balance of $5,810. Dr Larson will therefore receive $3,492, and Dr. McNichol will receive $2,905.

Subsequent to the partnership dissolution, Dr. McNichol leased space in the condominium to David Cuthbertson, a clinical audiologist who had been affiliated with

---

[2] Dr. Larson limits this aspect of his claim to prepayments made in late 2003 for BENT-AR obligations that were not due until sometime in 2004. He does not make a similar argument for prepayments he may have made in previous years, and so the court does not address that evidence.

[3] BENT-AR owned office equipment and other personal property as well as the condominium premises. *See* plaintiff's exhibit 1.

the parties previously. Cuthbertson paid Dr. McNichol a total of $4,500 for rent. Dr. McNichol agrees that Dr. Larson is entitled to half of those rental proceeds, or $2,250.

### B. Personal property

BENT-AR owned most of the personal property located in the office space. When Dr. Larson vacated the premises in mid-2004, he left the partnership personalty on site at Dr. McNichol's direction. *See* plaintiff's exhibit 40. When BENT-AR sold the condominium premises in 2005, Dr. McNichol retained some property; Cuthbertson took several items; and Dr. Larson's administrator took a bookcase. This still left a number of items, which Dr. McNichol donated to the buyer, a non-profit entity. Dr. Larson argues here that he is entitled to half the value of the partnership's personal property. He has not, however, presented any meaningful evidence about the value of the property. Although in his argument he suggests a cumulative value of $5,000, that figure is entirely speculative, and the court declines to adopt it. Further, his argument does not account for the credible testimony of David Cuthbertson, who stated that he took several items with the permission of both parties. Thus, not all of the property that is within Dr. Larson's claim would support the award that he seeks here.

### C. Post-dissolution occupancy by Dr. McNichol

No later than May 18, 2004, Dr. Larson provided actual notice to Dr. McNichol that he intended to dissolve BENT-AR effective June 30, 2004, and that he (Larson) did not consent to Dr. McNichol's use and possession of the condominium premises after July 1, 2004, in the absence of an agreement to the contrary.[4] *See* plaintiff's exhibits 2-4. Nonetheless, Dr. McNichol continued to occupy the premises and maintain his medical practice there until it was sold in 2005. As is noted above, he also leased some of the office space to David Cuthbertson. Dr. Larson claims here that he is entitled to recover half of the rental value of that occupancy for the relevant period of time. Dr. McNichol, on the other hand, contends that he was entitled to occupy the office space and that Dr.

---

[4] Dr. McNichol testified that sometime during the spring of 2004, Dr. Larson told him that he (Larson) wanted him (McNichol) to vacate the premises and that he (Larson) did not want to become his (McNichol's) landlord. It is not clear whether Dr. Larson told this to Dr. McNichol before or after the latter received the written notices noted in the text. Nonetheless, the evidence establishes that by May 18 Dr. McNichol was aware of the putative termination of any tenancy.

4

Larson is liable for half of the post-dissolution expenses that were associated with that occupancy because, he claims, those expenses were payable by BENT-AR and Dr. Larson did not contribute any money for the partnership to pay those expenses.

The first question raised by the parties' claims is whether Dr. McNichol has a leasehold interest that allowed him to occupy the premises after June 30, 2004. The court concludes that he did not. Dr. McNichol contends first that he had a lease agreement with BENT-AR that contractually entitled him to remain in the condominium. The record reveals that at one point, both Drs. Larson and McNichol were parties to a lease with BENT-AR. *See* plaintiff's exhibit 7A.[5] However, the best available evidence indicates that later in 2001 or in early 2002, the parties had provisionally agreed to a new lease agreement, which the parties received in draft form from the partnership's attorney. *See* plaintiff's exhibit 20. Dr. McNichol did not sign or agree to the terms of the new agreement.

Even if the parties' discussions that were embodied in the draft did not represent an abandonment or repudiation of the terms of the lease itself, *see* RESTATEMENT (SECOND) OF CONTRACTS § 279 (1981) (substituted contract), and the lease agreement remained in effect, that contract was subject to the ongoing condition, arising from operation of statute, that a partner is entitled to use partnership property for non-partnership purposes only with the consent of the remaining partners. *See* 31 M.R.S.A. § 305(1) (a partner "has *no right* to possess such |partnership| property for any other purpose |aside from partnership purposes| without the consent of his partners. . ." (emphasis added)). Here, the lease agreement underlying the parties' May 2001 writing was between BENT-AR and the respective parties. There is no evidence in this record that the lease agreement between BENT-AR and the parties included any provision controlling the method for its termination.[6] Thus, whether or not section 305(1) would

---

[5] Plaintiff's exhibit 7A is actually a document signed by the parties in their individual capacities outlining their agreement regarding their respective rights and responsibilities affecting the premises. It does not purport to be a lease agreement with the lessor, BENT-AR, although it could only derive from such a lease relationship.

[6] One aspect of the new lease agreement that was addressed in the 2002 draft was a timeframe for termination of the lease, which was to be on 60 days notice. *See* plaintiff's

5

control even in the face of a lease agreement that included a specific provision establishing the method its termination, the record does not include any evidence of a conflict between the terms of the lease agreement and the provisions of section 305(1). Therefore, because Dr. Larson withdrew his consent to Dr. McNichol's possession of the partnership property after July 1, 2004, and because there is nothing in the trial record that demonstrates that Dr. Larson was not entitled to do so, the court concludes that Dr. McNichol did not have the right to use the partnership property for his own practice (i.e., a purpose other than a partnership purpose) subsequent to that date.[7]

When Dr. Larson withdrew his consent to Dr. McNichol's possession of the premises subsequent to July 1, 2004, the lease agreement between BENT-AR and Dr. McNichol was vitiated effective that date. This undercuts Dr. McNichol's argument that he was obligated to pay only $1 annually. The evidentiary source of that rental charge is the May 2001 document signed by the parties, which, as is noted above, at most reflects the terms of the rental agreements between BENT-AR and each of the parties. In the absence of any contractual term establishing the cost of rent, the partnership was entitled to receive fair rental value. The best evidence of the rental value of the office space is found in an invoice that Dr. McNichol himself issued to Dr. Larson in May 2004.[8] *See* plaintiff's exhibit 25. In that invoice, Dr. McNichol purported to bill Dr. Larson $800 per month for the latter's office space. Dr. Larson occupied 56% of the total space within the condominium units. Based on the same assessment, Dr. McNichol's space had a rental value of $630 per month. The evidence does not warrant a finding that Dr. McNichol expanded his use of space into the area that Dr. Larson had occupied prior to the time he

---

exhibit 20. As is noted in the text, Dr. McNichol ultimately did not sign the writing that would have included this provision.

[7] Dr. McNichol argues in part that his ongoing occupancy of the condominium was part of the winding-up process followed by BENT-AR after it was dissolved. Clearly, Dr. McNichol's use of the premises went well beyond winding up. It was a full continuation of his occupancy of the premises, indistinguishable from the quality of that occupancy prior to the dissolution.

[8] Dr. Larson argues that the rental value should be assessed at $13 per square foot triple net, which is the figure he claims was proposed by Dr. McNichol's administrative assistant based on her market research. The evidence is not sufficient to attribute this opinion to Dr. McNichol himself.

closed his practice in Maine and vacated the office space in July 2004. And the rental value arising from the Cuthbertson lease is taken into account in the first section of this order.

Dr. McNichol vacated the premises roughly at the end of May 2005, which was several weeks prior to the closing. *See* plaintiff's exhibit 18 (closing statement, establishing the closing date). This means that Dr. McNichol continued to use the premises 10 and a half months after Dr. Larson vacated the premises in mid-July 2004. The value that Dr. McNichol derived from his use of the partnership property was therefore $6,615. Dr. Larson is entitled to be paid half of that amount, or $3,300 (rounded down).

During the time he maintained his practice on the partnership premises, Dr. McNichol incurred expenses that he paid directly. These expenses were for real estate taxes, electricity, water and sewer, and the like. Dr. McNichol argues here that Dr. Larson should be required to reimburse him half of these expenses, because he paid those costs to maintain partnership property. However, the partnership incurred those costs because Dr. McNichol continued to occupy the premises, even though he was not authorized to do so after Dr. Larson withdrew his consent to that arrangement. Although one could argue that the partnership would have incurred some of those costs during the time when it was trying to sell the property, it is impossible to determine how much those expenses would have been if Dr. McNichol had vacated the property when he lost his right to occupy it and the property had been listed for sale promptly. Under these circumstances, where that evidentiary uncertainty was caused by Dr. McNichol's actions, the court declines to assess any of those expenses against Dr. Larson.

For the same reason, Dr. Larson is entitled to reimbursement for half of the occupancy expenses that were outstanding at the time of the closing and that worked to reduce the net proceeds generated by the sale. Those charges amounted to $6,610, resulting in a credit of $3,300 (rounded down) for Dr. Larson.

Finally, when the condominium premises were listed for sale, Dr. McNichol unilaterally secured the services of an appraiser, who charged the partnership $2,000. Dr. Larson did not ratify this decision, and there is no evidence that the appraisal contributed to or promoted the ultimate sale of the premises. Further, the court declines to charge Dr.

7

Larson for the work that Dr. McNichol's assistant may have carried out when the property was listed for sale.

**D. Conclusion**

When BENT-AR sold the condominium premises, the parties agreed to withhold a portion of the sale proceeds in escrow, to be distributed to them upon adjudication of their claims in this case. The net result of the court's conclusions noted above will entitle Dr. Larson to receive $7,187 more than the amount that Dr. McNichol will receive from the partnership assets that have not yet been distributed to them.

By agreement of the parties, they shall equally divide the bill for accounting services and tax work performed for and associated with the winding down of the partnership.

The entry shall be:

For the foregoing reasons, judgment is entered for the plaintiff in the amount of $7,187, plus pre-judgment interest at the annual rate of 4.28%, post-judgment interest at the annual rate of 10.36%, and his costs of court.

Dated: September 15, 2006

Justice, Maine Superior Court
Jeffrey L. Hjelm

8

HENRY LARSON MD VS DANIEL MCNICHOL MD
UTN:AOCSsr  -2004-0063401                      CASE #:BANSC-CV-2004-00119
------------------------------------------------------------------------
SEL VD                             REPRESENTATION TYPE      DATE
01 0000000395 ATTORNEY:GILBERT, CHARLES III
ADDR:82 COLUMBIA ST PO BOX 2339 BANGOR ME 04402-2339
    F FOR:HENRY LARSON, MD                      PL         RTND   06/10/2004


02 0000000392 ATTORNEY:GLAZIER, MARVIN
ADDR:23 WATER STREET PO BOX 919 BANGOR ME 04402-0919
    F FOR:DANIEL MCNICHOL, MD                   DEF        RTND   07/15/2004




Select A=Atty, B=Bail, D=DckPr, E=Evt, F=Fin, J=Jdgm, O=Ordr, P=Prty, R=Review:

To exit this option, select the EXIT KEY.